**STEERS SAND AND GRAVEL CORP., as owner of THE SCOW H.S. 89, her tackle, etc., Libellant,**

v.

**MORAN TOWING AND TRANSPORTATION CO., Inc., Respondent.**

United States District Court
S. D. New York.

June 19, 1956.

Macklin, Speer, Hanen & McKennan, New York City, by Leo Hannan, New York City, of counsel, for libellant.

Burlington, Hupper & Kennedy, New York City, by Robert F. Lynch, New York City, for respondent.

EDELSTEIN, District Judge.

The issues in the above entitled cause having regularly come on for trial before me on April 5 and 6, 1956 and having been duly submitted by proctors for the respective parties on oral argument and briefs, I now make the following findings of fact and conclusions of law.

## Findings of Fact

1. On January 13, 1952 deck scow H. S. 89 was owned by Steers Sand & Gravel Corporation.

2. H. S. 89 was constructed of wood in 1911. She was 119.4 feet in length, 35.8 feet in width, 11.7 in depth, and raked at bow and stern. The 89's draft on the early morning of January 13, 1952 was about 9½ feet. It carried a split load of gravel forward and sand aft in two piles with a total weight of 700 to 750 tons on a flat wooden deck surrounded by a railing two feet high. The hull was empty for the full length of the scow save for internal cross-supports and timbers (Resp. Exhs. A, C; 25, 27–8, 43, 229, 246).

3. The 89's captain had pumped out the scow some five to ten minutes around 5 p. m., January 12. The pump was started from the deck. The captain could not recall when he had last entered the scow's hull to make an inspection but he usually inspected below decks once a week (62, 69, 71). The last dry docking of H. S. 89 prior to the occurrence was some time in 1949. No definite proof was offered by libellant as to when the seams were last caulked (231–6; Resp. Exhs. K, L).

4. About 3:30 a. m., Sunday, January 13, scow H. S. 89 left the Steers stakeboat near the Statue of Liberty for Rossville, New Jersey in tow of libellant's tug Henry Steers which had placed four loaded scows on a hawser astern comprising two tiers of two boats each. The 89 was the starboard boat in the second tier (61, 63, 69, 91–3).

5. At approximately 6 a. m., January 13 when the Steers flotilla was passing Elizabethport, New Jersey in the Arthur Kill, the Red Star tug Roselyn drew alongside tug Henry Steers and warned her master that the 89 was listing and appeared ready to capsize. Until that time those aboard the Henry Steers had been unaware of the 89's sinking condition (70, 76, 82–3, 91–3, 109).

6. About the time the Red Star's tug alerted the Henry Steers, the captain of the scow alongside the 89 hailed the 89's

captain and warned him of the scow's listing condition. The starboard side of the H. S. 89 was then underwater. The captain of the 89, who had been asleep since departure from the stakeboat, appeared on deck undressed and abandoned his scow at once by jumping to the Steers scow alongside without returning for his clothes (65-6, 70, 93, 105).

7. The captain of the Henry Steers then directed the Red Star tug to beach the 89 on the Staten Island side of the Arthur Kill. The bow of the scow was grounded on the Staten Island bank about 1000 to 1200 feet north of the B. & O. drawbridge. The other three scows were tied up by the Henry Steers at the Loizeaux cement dock (4-7, 21, 40-1, 93-4, 101-2, 205; Resp. Exhs. B, D, E).

8. The Henry Steers returned to the 89, and attempted to shove it further up on the beach. The tide was then rising. The tug's master did not refer to the chart aboard as to the nature or condition of the bottom where the 89 lay beached. None of the Henry Steers' crew made an inspection of the hull to determine the nature or location of the leak. No soundings were taken (32, 43, 93-4, 102-4, 107, 227-8).

9. The 89 was equipped with a gasoline pump in working order capable of discharging 5,000 gallons of water per hour. The tug carried a steam siphon of at least equal capacity. No effort was made by the tug's crew to start tug or siphon for about three hours until the arrival of libellant's Marine Superintendent between 9 and 9:15 a. m. The Superintendent boarded the scow with a second pump of 5,000 gallons capacity (29-30, 47-9, 65, 83-4, 95, 104-6, 110).

10. The Marine Superintendent entered the hull and found at least 2 feet of water at the 89's bow and 3 feet at its stern. The tide began to fall about 9 a. m. The two pumps and a siphon of 5,000 gallons capacity each were employed continuously from about 9:30 until noon or shortly afterwards when the scow capsized. During this period the Henry Steers lay across the stern of the scow with her starboard side secured to the 89 by two lines (7-9, 30, 32, 49-50, 95-6, 227-8). During pumping operations approximately 37,000 gallons of water were discharged. When the scow turned bottom up there was still about 1½ feet of water at the bow and 2½ feet at its stern (49-50).

11. The bow of the 89 was grounded on a ledge or muddy silt shelf, lying somewhat at an angle to the bank. This shelf or ledge dropped off sharply into the channel which had been dredged to a minimum depth of 37 feet in 1947 or 1948. There was at least 37 feet of water under the stern of the 89 and at least one half of its length lay in deep water at the time of its capsizing (7, 23, 43, 45, 243-6, 249-51, 256; Resp. Exhs. D, E, M).

12. As the tide ebbed over a three hour interval, the stern of the scow dropped on the falling tide and the great quantity of water in its hull flooded aft, substantially reducing its stability and materially increasing its tendency to shift the cargo of gravel and sand on deck. The scow's lying at an angle to the bank would tend to induce tipping. The above forces in conjunction with its prior list and unseaworthy condition caused the bow of H. S. 89 to slide from the shelf on which it had rested and capsize (7, 23, 27-8, 32-4, 45, 49-51, 252-4, 276-7; Resp. Exhs. A, D, E, M). The Steers scow capsized about noon, January 13, 1949, in the Arthur Kill at the point where it had been beached early that morning, careening first to starboard throwing part of its load and then turning completely over to port (9, 10, 25, 33).

13. The opportunities for observation on the part of libellant's witnesses were limited because of the activities in which they were engaged and the respective locations on the Henry Steers from which they purportedly observed the traffic at or below the bridge. The Steers Marine Superintendent was inside the scow as it commenced to capsize and jumped aboard the starboard side of the tug. The Henry Steers' master, engineer and fireman at this time were occupied in tending the lines, siphon and pumps. Immediately

thereafter, the engineer and fireman went to the engine and fire rooms of the tug. Upon letting go all but one line to the scow, the Henry Steers' master went to the pilot house and backed the tug away from the overturned scow (10–11, 33, 37–9, 41, 78, 81, 84–6, 96–7, 106–7, 115–16, 118).

14. The two unidentified light tugs, which libellant's witnesses testified they saw for the first time below the B. & O. bridge proceeding in a south bound direction, were 1000 to 1200 feet away when first sighted. None of libellant's witnesses noticed these tugs until after the scow had capsized and the Henry Steers had backed away (39, 41, 81, 97, 106–7, 118; Resp. Exhs. B, E). The witnesses were unable to identify either tug by name. Their description of the tugs which they asserted were Moran vessels fitted the description of tugs owned by others operating in the Harbor (34–7, 121–3).

15. Libellant did not produce any witness who saw the scow capsize due to any swell created by the two tugs purportedly sighted at or below the bridge, nor offered any credible testimony as to the speed of the tugs (13, 14, 78–9, 89–108, 113–14). None of the captains on the three Steers scows quietly moored across the Kill from H. S. 89 at the cement dock were called to testify regarding swells (5, 19–20). However, seventeen vessels, none of which were respondent's, were logged through the B. & O. bridge between 6:30 a. m. and 1:00 p. m. Thirteen of these were noted by the bridge engineer between 8:00 a. m. and 1:00 p. m. (Resp. Exh. J). The Arthur Kill is subject to continuous traffic (210, 167; Resp. Exh. E).

16. The records of Moran Towing & Transportation Co., Inc., show that only nine of its tugs were operating in New York Harbor Sunday, January 13, 1952. The tug reports or logs of all tugs which the Moran records indicated were operating in the Harbor as well as all log sheets of its tugs operating offshore were produced at trial. The log entries for each of these tugs record each operation performed and the time consumed. The logs do not disclose that any of the Moran tugs was in the Arthur Kill at any time between 9:00 a. m. and 1:00 p. m. except tugs Barbara Moran and Agnes A. Moran (126–8, 130–3, 136–7, 150–5; Resp. Exhs. G, H, I). The tug Barbara Moran assisted a liberty-type deep sea tanker from Perth Amboy to Kearney, New Jersey, departing at 6:30 a. m. No allegation is made that a Moran tug assisting a tanker was involved (Libel; Resp. Exh. I; 133–6). Tug Agnes A. Moran saw the scow capsize between one-half mile and 700 yards to the south along the Staten Island bank while the Agnes was proceeding at slow speed along the New Jersey side of the Arthur Kill between Recreation Wharf and the Elizabeth Ferry rack. Libellant's counsel conceded at the close of trial that tug Agnes A. Moran was not involved (162–4, 187–8, 198–200, 284; Resp. Exhs. E, I).

17. The logs do not necessarily recite all of the movements of the respondent's tugs at the time in issue, and therefore do not positively exclude the possibility of other Moran tugs having been in the vicinity. Nevertheless, although respondent's evidence is not in itself dispositive, the libellant's evidence is not sufficiently convincing and fails to measure up to the quantum of proof required.

18. The H. S. 89's capsizing is fully explained by its prior sinking condition and the failure of those in charge of libellant's scow to notice its list seasonably or to start the pump and siphon promptly with which the flotilla was equipped. Its stability was further reduced when its bow was grounded on a ledge from which the scow slipped into deep water on the falling tide.

## Conclusions of Law

1. Respondent was not negligent.

2. The capsizing of H. S. 89 was not caused by any act or omission of respondent.

3. Libellant has failed to sustain its burden of proof.

4. The capsizing of H. S. 89 and any consequent damage it sustained was due

to its prior unseaworthy condition, negligent towage by libellant's tug Henry Steers and libellant's failure to take timely and proper action to save the scow.

5. The libel against Moran Towing and Transportation Co., Inc. should be dismissed and a decree entered in favor of respondent, with costs.